IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

RYAN BUI,

              Petitioner,

  v.

ANTHONY HEDGPETH, Warden,

              Respondent.

No. C 11-03167 SI

**ORDER DENYING HABEAS PETITION**

This matter concerns a petition for a writ of habeas corpus brought by a state prisoner pursuant to 28 U.S.C. § 2254.  Petitioner contends that his 2007 conviction on two felony counts of residential burglary and related offenses violated his constitutional rights under the Fifth, Sixth, and Fourteenth Amendments.  Respondent was ordered to show cause why the writ should not be granted.  Respondent has filed an answer, along with a supporting memorandum of points and authorities.  Petitioner has responded with a traverse, and has also filed supplemental authority with the Court.  Having carefully considered the papers submitted, the Court DENIES the petition for a writ of habeas corpus, for the reasons set forth below.

**BACKGROUND**

**I.     Procedural Background**

On June 15, 2007, following a jury trial in the San Mateo County Superior Court, Ryan Bui ("petitioner") was convicted of two counts of residential burglary and related offenses.  On October 3, 2007, the Superior Court entered a judgment and sentenced petitioner to a total of forty-eight months to life in prison.

Petitioner appealed his conviction and sought state habeas relief in the California Court of

**United States District Court**
For the Northern District of California

Appeal. The Court of Appeal affirmed his conviction on October 7, 2009, and petitioner's habeas petition was denied on October 30, 2009. The California Supreme Court granted review of the appellate court's affirmation of the conviction and denial of the petition for a writ. It vacated the appellate court's decision and directed it to reconsider in light of the United States Supreme Court's then-recent decision in *Presley v. Georgia*, 558 U.S. 209 (2010). The California Court of Appeals, on April 6, 2010, again affirmed petitioner's conviction even in light of *Presley*. On July 2, 2010, the California Supreme Court denied review.

Petitioner filed the instant habeas petition in this Court on July 27, 2011. He challenges his conviction on the grounds that several of petitioner's family members and/or friends were excluded from the courtroom during a portion of the *voir dire* proceedings. Petitioner contends that this exclusion violated his Sixth Amendment right to a public trial. Petitioner also challenges his conviction on the grounds that the trial court improperly excluded evidence, which, petitioner suggests, would have corroborated his assertion that a third-party, rather than petitioner, committed the crime charged. Petitioner asserts that this exclusion violated his right to present a defense under the Fifth, Sixth, and Fourteenth Amendments.

## II.    Factual Background

The California Court of Appeal, upon remand, set forth the factual background of the case as follows:

> On March 10, 2004, a number of homes in Foster City were burglarized. Sharon and Yao Chi reported jewelry and cash missing from their Beach Park Boulevard home that day. Police also discovered that the home of George and Pamela Hung, also of Beach Park Boulevard, was burglarized the same day.

> A third homeowner, Tommy Hui, was at home on Williams Lane [on] March 10th. He heard the doorbell ring, but did not answer the door because he did not recognize the black Range Rover parked in front of his house. Ten or fifteen minutes later, Hui heard the noise of his gate opening, and then heard a metallic ringing sound. He went downstairs, and saw two men at his sliding glass door. Hui started yelling, and both men fled. Hui called [the] police, describing the black Range Rover and giving them a partial license plate number.

> Foster City police officer William Sandri responded to the call. Within two minutes of receiving the call, as he headed towards Williams Lane, Sandri saw a black Range Rover matching the description given. The Range Rover was stopped at a stop sign at the corner of Edgewater Boulevard and Port Royal Avenue. Sandri observed "two

**United States District Court**
For the Northern District of California

1  light skinned males" in the vehicle, which he followed. He lost sight of the vehicle for
2  "a minute or more," then saw it again in front of a RadioShack store in a shopping center
   on Edgewater. Sandri turned on his emergency lights in order to stop the vehicle. The
3  Range Rover turned down an alley "at a high rate of speed." Sandri pursued the vehicle,
   which came to a stop at the alley's dead end. The two men in the vehicle exited and fled
4  southbound out of the parking lot. Sandri gave chase and caught up with them near the
   south end of the shopping center. The two men were "doubled over out of breath," and
5  Sandri ordered them to get on the ground. Sandri identified Bui as one of the men and
   Hoa Khuu as the second person.

6      Neither man complied with Sandri's order, instead "jump[ing a] wall" into the
   yard of a residence on Monterey Avenue. Sandri radioed for backup, and informed his
7  colleagues of the direction the men were headed. Foster City police officer Mark Lee
   responded and met Sandri on the 1000 block of Monterey. Lee went through the
8  backyard of a residence and saw an Asian male, later identified as Hoa Khuu, running
   along the water of a lagoon behind the house. Khuu first hid on a boat, then went in the
9  water, saying to the officers "[G]o ahead and fucking shoot me." He then got out of the
   water and continued to run, eventually being found hiding in a garbage can.
10
11     That same day, Mary Elkington heard a noise outside her Bristol Court, Foster
   City home. She went outside and saw an Asian male in his 20s. She asked him what he
12  was doing, then told him to leave. The man got down on his knee behind some trees and
   gestured as though "[h]e wanted [her] to be quiet." The man then got up and ran. Later,
13  Elkington's husband found two pieces of paper in the spot where the man had hidden.
   One was Bui's interim driver's license, and the other was a list of names, addresses and
14  telephone numbers. The Hung and Chi addresses were on the list, with a line through the
   Hung's address.
15
16     Foster City police officer Eric Egan also responded to Sandri's call. He went into
   the backyard of a house near Elkington's home, and saw Bui on the ground under some
17  bushes. He told Bui to get out of the bushes and down on the ground. As Egan holstered
   his gun, Bui fled. Other officers joined the chase, and they and Egan "took [Bui] to the
   ground and placed him in handcuffs."
18
19     Khuu testified at trial that he and Mark Pham had committed the burglaries, not
   Bui. He claimed that Pham utilized information gleaned during his employment at a real
20  estate firm to make the list of names and addresses found by the Elkingtons, targeting
   Asian families based on a belief that they kept cash in their homes. Khuu said that he and
21  Pham asked to borrow Bui's Range Rover (which was registered to Bui's sister) on
   March 10th, but did not tell him they intended to commit burglaries. He also borrowed
22  Bui's driver's license, in case the police pulled them over. Khuu stated that Bui drove
   him and Pham to a shopping center in Foster City, then got out of the car. Khuu told Bui
23  they were going to visit a friend, but instead they committed the burglaries. After a
   homeowner chased them, they went to pick up Bui who was waiting inside the
24  RadioShack. Pham ran into the store and got Bui. Pham got into the back seat of the
   Range Rover and crouched down. A police car started following them about 30 seconds
25  after he picked up Bui. Pham then asked him to pull over and let him out of the vehicle,
   which he did. While the police were chasing them down the alley, Khuu gave Bui's
   driver's license back to him, with the paper containing the list of addresses attached.
26
       The jury found Khuu's testimony unconvincing and, as noted previously,
27  convicted Bui on all charged counts.

28  Pet., Ex. C at 2-4 (brackets in original).

3

**LEGAL STANDARD**

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  In reviewing a petition for a writ of habeas corpus, a district court "looks to the decision of the highest state court to address the merits of a petitioner's claim in a reasoned decision." *Bartlett v. Alameida*, 366 F.3d 1020, 1023 (9th Cir. 2004).

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which sets out the standard of review for a petition for a writ of habeas corpus.  Under AEDPA, a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim either (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if the state court "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  A state court decision is an "unreasonable application of Supreme Court authority, and, therefore, falls under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ. *See id.* at 409.

"Factual determinations by state courts are presumed to be correct absent clear and convincing evidence to the contrary." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  Under 28 U.S.C. §

2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Id.*; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

In order to obtain a writ of habeas corpus from a federal district court under either prong of AEDPA, the petitioner must show that the "state court's ruling on the claim being presented . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011). This very high standard is intended to "ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems," and not as a means of ordinary error correction. *Id.*

## DISCUSSION

### I.      Petitioner's Sixth Amendment Right to Public Trial

Petitioner contends that, when the trial court excluded several friends and/or family members from the courtroom during *voir dire*, his Sixth Amendment right to a public trial was violated. He also argues that the state court made an unreasonable determination of the facts in its analysis of the closure during *voir dire*.

### A.      Facts of *Voir Dire* Closure

The first day of *voir dire* in petitioner's trial began at 9:55 a.m. and concluded at 4:45 p.m. The second day, the jurors entered the courtroom at 10:05 a.m., and at approximately 11:00 a.m. the court recessed and placed on the record several side bar discussions. Then at 11:05 a.m., Bui's attorney made the following motion:

> "[A]t approximately 10:20, Mr. Bui's family came in and I noticed they arrived and they sat in the row, I think the second row together as much as they could. There were many empty seats at that point although the potential jurors were also seated in the body of the courtroom. I noticed that the bailiff removed them from the courtroom and they have been removed from the courtroom since. It is now 11:05. [¶] At the bench, the Court informed me that it is the Court's policy not to let members of the family sit in the audience while *voir dire* is going on and jurors are being selected for fear that the family might say something inappropriate and taint the process. While I appreciate the Court's concern and certainly do not wish any tainting on this process, this is a public proceeding

1   and Mr. Bui's family and Mr. Bui himself have the right to have a complete open and
2   public process. And there are alternatives to the Court, for example, setting aside certain
    seats and sitting the jury in another section of the audience or admonishing the family.
3   There are alternatives to summarily removing . . . the family from the courtroom during
    this proceeding, and for that reason, I would move that the panel be stricken and we start
4   anew."

5   Pet., Ex. C at 11-12.  The trial judge responded:

6   "... I would agree with you that if I had been told that the family was going to be there
    or given any notice whatsoever, what I would [have] said to you is to admonish these
7   people from not discussing anything in front of the prospective jurors, and we would
    [have] made provisions to have them sit that as best we could in a fashion that's
8   segregated from the rest of the jurors, but they just showed up and there they were. I
    have to make these decisions at that moment, and I can't risk having potential jurors
9   hearing conversation among the family, it would totally prejudice the panel, so I have
    to make these decisions quickly. And again, I wish it had not happened that way, but
10  they're only excluded for a few minutes. I don't remember when they showed up, but
    you can certainly accommodate them after they have been admonished. I'm just not
11  going to take that kind of chance."

12  *Id.* at 12.  After Bui's attorney explained that he had admonished the family the previous day, the trial

13  judge continued his explanation:

14  "But I just wasn't given any heads up that these people were going to be here otherwise
    we would have discussed that issue and handled it in some fashion which we do all the
15  time.  It's not unusual, it's fairly typical to have family members watch a trial, we just
    need to kind of know these things so . . . we can handle them in one way or the other. So
16  I don't think it's a great prejudice, the fact that they have been excluded from the
    courtroom for a few minutes, I mean literally so[.]"

17  . . . . The court denied the motion to strike the jury panel, stating "It's not a member of
18  the public. . . . I mean, you know as well as I do that people say things that they don't
    realize are being overheard by other people, that's my job to guarantee both sides a fair
19  trial. So again, if I know these things are going to happen then I will deal with them
    appropriately, and hopefully fairly, but I have to deal with things as they happen."

20  *Id.* at 13.   Finally, after confirming that the family had been properly admonished to make no

21  communications with the potential jurors, the trial judge stated that they would be allowed to return to

22  the *voir dire* proceedings, as long as the bailiff sat them away from the prospective jurors. *Id.* Jury

23  selection continued for another 33 minutes that day, and 20 minutes the following day. The Court of

24  Appeal found that the record was silent as to whether members of Bui's family attended on the third day

25  of *voir dire*, but that "[t]here is no question here that three individuals were excluded from the *voir dire*

26  examination for a period of roughly 40 minutes." *Id.* at 13-14.  It is to these facts that the Court of

27  Appeal applied its legal analysis.

28

**United States District Court**
For the Northern District of California

6

**United States District Court**
For the Northern District of California

### B.     The Sixth Amendment Right to Public Trial

The Sixth Amendment directs, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a . . . public trial." U.S. CONST. amend. VI.  The right was created, in part, for the benefit of defendants, as the presence of spectators ensures that judges, lawyers, and witnesses carry out their respective functions responsibly.[1]  *See Waller v. Georgia,* 467 U.S. 39, 46 (1984)(defendant's Sixth Amendment right to a public trial applies to a suppression hearing).  An open trial "enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system."  *Press-Enterprise Co. v. Superior Court of Cal.*, 464 U.S. 501, 508 (1984) ("*Press Enterprise I*")(the guarantees of open public proceedings in criminal trials cover proceedings for the *voir dire* examination of potential jurors).

While it is "well-settled" that the right to a public trial in criminal cases extends to the jury selection phase of trial, including the *voir dire* of prospective jurors, *Presley*, 558 U.S. at 213 (relying on *Waller* and *Press-Enterprise I*), the Supreme Court has recognized that there are exceptions to the Sixth Amendment right to a public trial.  To support a closure of *voir dire* proceedings, the trial judge must make the following four findings: (1) the party seeking the closure must advance an overriding interest that is likely to be prejudiced, (2) the closure must be no broader than necessary to protect that interest, (3) the trial court must consider reasonable alternatives to closing the proceeding, and (4) it must make findings adequate to support the closure.  *Id.* at 214 (quoting *Waller*, 467 U.S. at 48).

In *Presley*, the trial judge excluded the defendant's uncle, who was also the sole public observer, from the entire *voir dire* process.  558 U.S. at 210.  The trial judge explained that there was no space for the uncle, but that he could return for the trial, which would be open to the public.  After the defendant was convicted, he moved for a new trial based on the exclusion of his uncle and presented evidence that there was room for the uncle if some of the jurors sat in the juror box.  The judge denied the motion, explaining that it was within his discretion to determine what would be comfortable seating for the jurors and to close *voir dire* if he was concerned that the jurors may hear a prejudicial comment

---

[1] The right to a public trial is also implicated in the First Amendment and protects the rights of the public to attend court proceedings. *See Press-Enterprise Co. v. Superior Court of Cal. for Riverside County*, 478 U.S. 1 (1986) ("*Press Enterprise II*").  The concern here, however, is only with the right to a public trial as it relates to a defendant's Sixth Amendment rights.

7

1  if they sat too close to the uncle.  The Georgia Court of Appeals and the Georgia Supreme Court both

2  affirmed.  *Id.* at 210-11.

3      The United States Supreme Court reversed.  It found that the Georgia Supreme Court had erred

4  by not requiring the trial court to explicitly consider alternatives to closure.  *Id.* at 214.  "The conclusion

5  that trial courts *are required to consider* alternatives to closure even when they are not offered by the

6  parties is clear not only from this Court's precedents but also from the premise that '[t]he process of

7  juror selection is itself a matter of importance, not simply to the adversaries but to the criminal justice

8  system.'"  *Id.* (quoting *Press-Enterprise I*, 464 U.S. at 505) (emphasis added).

9      Violation of a defendant's right to a public trial is considered structural in nature and reversible

10 without the need for the defendant to "show specific prejudice in order to obtain relief."  *Waller*, 467

11 U.S. at 49.  As such, a defendant does  not have to show actual prejudice to have a conviction

12 overturned; rather, a denial of the public trial right "requires automatic reversal."  *Washington v.*

13 *Recuenco*, 548 U.S. 212, 218 (2006) (citing *id.*).

14

15      **C.      Applicability of *Presley* to a *De Minimis* Analysis**

16      Petitioner argues that the trial court committed constitutional error when it removed petitioner's

17 family members and/or friends from the courtroom during a portion of the *voir dire* process without

18 making the explicit findings required by the Supreme Court in *Press-Enterprise I*, *Waller*, and *Presley*,

19 including the necessity of closure and the lack of reasonable alternatives.

20      The California Court of Appeal, while recognizing the requirements in *Presley*, found that "not

21 every closure of a trial or exclusion of certain spectators rises to the level of a constitutional violation,

22 and that certain exclusions or closures are so 'de minimus'[2] that they do not violate a defendant's

23 constitutional public trial rights."  Pet., Ex. C at 8-9.  The Court of Appeal then noted two decisions by

24 California courts (one by the California Supreme Court, one by a California Court of Appeal) and

25 several decisions by federal Circuit Courts of Appeals in which those courts had employed a *de minimis*

26 rationale to determine if one's right to a public trial has been violated.  *Id.* at 9-11.  The Court of Appeal

27

28      [2] The correct spelling is "de minimis."

United States District Court
For the Northern District of California

8

1    then found that "*Presley* did not consider or address, either expressly or implicitly, the 'de minimus

2    rationale' or 'triviality standard' recognized by both the California Supreme Court and several federal

3    courts." It then applied the *de minimis* test to the facts, and found that:

> Here three individuals were excluded for a very limited period, during only a small part
> of the voir dire of prospective jurors, and not during the evidentiary phase of the trial.
> They were allowed to return as soon as defense counsel brought the issue to the court's
> attention and assured the court that they had been appropriately admonished—an
> alternative to closure considered and promptly implemented by the court. Were we to
> preclude application of a de minimus analysis under such circumstances, even temporary
> removal of a spectator from proceedings simply for purposes of giving an appropriate
> advisement to refrain from comment or contact with jurors could constitute per se
> structural error. Given what we find to be the de minimus nature of the temporary
> exclusion of these individuals from only a limited portion of voir dire, we likewise find,
> as did the Supreme Court in *Woodward*, that this "temporary 'closure' did not violate
> defendant's fundamental constitutional right to a public trial." *People v. Woodward*, 4
> Cal. 4th 376, 379 (1992). We do not read *Presley* as mandating a different result.

11   Pet., Ex. C at 16.

12          In short, the Court of Appeal found that applying a *de minimis* analysis to the exclusion of

13   petitioner's friends and family for a portion of *voir dire* was not inconsistent with *Presley*. Furthermore,

14   because the Court of Appeal found that the exclusion was *de minimis*, it did not have to reach the

15   question of whether the trial court failed to consider alternatives to closure or whether such failure

16   amounted a constitutional violation.

17          Petitioner now argues before this Court that applying a *de minimis* rationale to these facts is

18   contrary to the clearly established Supreme Court precedent of *Presley* and that a writ of habeas corpus

19   should be granted pursuant to 28 U.S.C. § 2254(d)(1). Petitioner argues that *Presley* requires that trial

20   judges always follow certain procedures prior to closing the courtroom to the public. He further

21   contends that the Supreme Court in *Presley* makes no mention of a *de minimis* analysis, and that

22   application of such an analysis in a way that would excuse a trial court's failure to follow the directives

23   set forth in *Presley* would be contrary to clearly established Supreme Court precedent.

24          The Court disagrees, and finds that the Court of Appeal's decision was not contrary to, nor did

25   it involve an unreasonable application of, clearly established Supreme Court precedent. *Presley* did not

26   address the applicability of a *de minimis* analysis to exclusion of spectators from *voir dire* proceedings,

27   much less clearly establish a rule against its application. For AEDPA purposes, that ends the inquiry

28

**United States District Court**
For the Northern District of California

9

and this Court need not predict what the Supreme Court's answer to the question will be.[3]   This Court has found no Supreme Court precedent addressing a temporary exclusion from the *voir dire* process (here, approximately 1 hour out of a 3-day, 9-hour *voir dire* process), or an exclusion which was immediately lifted once the matter was brought to the trial court's attention and the spectators were appropriately admonished.

Under AEDPA, this Court may only consider whether the California court violated clearly established Supreme Court precedent.  As the Supreme Court has not addressed this issue, this Court cannot find that there is clearly established law on the applicability of the *de minimis* standard to exclusions during *voir dire*. The AEDPA standards set out in 28 U.S.C. § 2254(d)(1) preclude granting the petition on this basis.

### D.      Unreasonable Application of Facts in Sixth Amendment Claim

Petitioner also contends that the Court of Appeal relied upon unreasonable determinations of fact when it applied the *de minimis* analysis.  Specifically, petitioner contends that the Court of Appeal made unreasonable factual findings about the duration of the exclusion from the courtroom, the number of individuals excluded, the impetus for the exclusion, and substance of the proceedings during the exclusion.  He further contends that the Court of Appeal's decision was based on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2), and that this misstep warrants habeas relief.

When a habeas petitioner challenges finding of facts made by the state courts, the state court's findings are presumed to be correct absent clear and convincing evidence, 28 U.S.C. § 2254(e)(1), and

---

[3] Other courts are divided on the issue. *Compare U.S. v. Greene*, 431 Fed. Appx. 191, 197 (3d Cir. 2011) (adopting the district court's finding that "*Presley* does not fundamentally alter the nature of the triviality inquiry"), and *Barrows v. United States*, 15 A.3d 673 (D.C. 2011) (holding that a brief closure of the courtroom during *voir dire* did not compromise the integrity of defendant's trial), *with United States v. Gupta*, 699 F.3d 682 (2d Cir. 2012) (overruling *en banc* a Second Circuit decision that applied the *de minimis* doctrine to allow the intentional exclusion of public from *voir dire* without making any *Waller* findings, and finding the defendant's Sixth Amendment rights were violated). *See also Second Circuit Affirms Conviction Despite Closure to the Public of A Voir Dire*, 125 HARV. L. REV. 1072 (2012) (criticizing the Second Circuit's first decision in *Gupta*, before the *en banc* reversal, as improperly using the *de minimis* doctrine to add a harmless error inquiry to a structural error analysis).

**United States District Court**
For the Northern District of California

1    the state court's judgment "will not be overturned on factual grounds unless objectively unreasonable

2    in light of the evidence presented in the state-court proceeding," 28 U.S.C. § 2254(d)(2). *Miller-El*, 537

3    U.S. at 340.

4

5                              **(1).      Duration of the exclusion**

6             The Court of Appeal found that petitioner's friends and/or family members were initially

7    excluded from the courtroom at roughly 10:20 a.m. on June 7, 2007.  Petitioner's counsel then brought

8    the exclusion to the attention of the court just before 11:05 a.m., and moved that the entire jury panel

9    be struck and the process be started over due to the exclusion of the individuals from the courtroom.

10   During an exchange between petitioner's counsel and the trial judge, counsel informed the judge that

11   counsel had admonished the individuals, prior to their exclusion, not to discuss the case in front of the

12   prospective jurors.  After hearing this, the judge essentially lifted his order that the individuals be

13   excluded from the courtroom, and *voir dire* resumed at 11:27 a.m. and concluded for the day at noon.

14   However, the excluded individuals had by then already left the courthouse and returned home.  In

15   addition, they were not notified that they could return.  Therefore, in addition to missing the portion of

16   the *voir dire* between their initial exclusion around 10:20 a.m. and counsel's motion just before 11:05

17   a.m. – roughly 40 minutes – the individuals were also absent from the time between the resumption of

18   *voir dire* proceedings at 11:27 a.m. and their conclusion at noon – an extra 33 minutes.  These facts are

19   not in dispute between the parties.

20            Given this record, the Court of Appeal found that petitioner's friends and family were "excluded

21   from the courtroom for about 40 minutes during jury voir dire."  Pet., Ex. C at 5.  Petitioner contends,

22   however, that the exclusion actually lasted for 73 minutes – the 40 minutes accepted by the court, plus

23   the extra 33 minutes between when the *voir dire* resumed and when it concluded for the day.  This

24   dispute is not based on different readings of the factual record before the Court of Appeal.  Rather, it

25   is based on differing methods of calculating the duration of the exclusion.  The Court of Appeal held

26   that the duration equals "the time between the exclusion of individuals from the courtroom and the

27   court's authorization for their return."  *Id.* at 5 n.4.  Petitioner contends, however, that the duration of

28   exclusion should equal the time between their initial exclusion from the courtroom and when they were

**United States District Court**
For the Northern District of California

1  notified that they were allowed to return.

2      A federal court must presume that a state court's factual findings are true absent clear and

3  convincing evidence to the contrary.  Here, there is no "evidence" to the contrary.  Whether the

4  exclusion lasted for 40 or 73 minutes is not based on a particular reading of any evidence in the record,

5  but on a particular method of calculating time based upon that factual record.  Petitioner cites no

6  authority to show that his suggested method of calculation is the only "reasonable" one.  Therefore, this

7  Court cannot conclude that the Court of Appeal's factual finding that the exclusion of petitioner's

8  friends or family members lasted 40 minutes was objectively unreasonable.

9

10                    **(2).    Number of spectators excluded**

11      Petitioner also argues that the Court of Appeal's factual finding that three individuals were

12  excluded from *voir dire* is directly contradicted by the factual record, which indicates, petitioner argues,

13  that four individuals were excluded from the proceedings.  Petitioner contends that this factual

14  determination was "unreasonable" within the meaning of 28 U.S.C. § 2254(d)(2) and that it provides

15  grounds for habeas relief.

16      Here, the record before the Court of Appeal could support a finding that there were either three

17  or four individuals excluded from the *voir dire* proceedings.  The Court of Appeal found that petitioner

18  himself suggested that only three individuals were excluded from the courtroom, describing those

19  individuals, in his motion for a new trial, as "his mother, his aunt (who was visiting from Vietnam), and

20  a person not related to the defendant, Lily Wong."  Pet., Ex. C at 5 n.3.  On the other hand, the Court

21  of Appeal acknowledged that petitioner's state habeas petition was accompanied by the declarations of

22  *four* individuals suggesting they were excluded.  *Id.*  In light of this conflicting evidence, the Court of

23  Appeal's factual determination that three, rather than four, individuals were excluded cannot be said to

24  be contradicted by the clear and convincing evidence necessary to rebut the presumption of correctness

25  of the Court of Appeal's finding.  Therefore, the Court of Appeal's finding that three individuals were

26  excluded from the proceedings was not unreasonable.

27

28

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

### (3).     Impetus for the exclusion

Petitioner argues that the Court of Appeal made a factual finding that the closure of the courtroom was inadvertent, i.e. that the bailiff removed the spectators from the courtroom without a directive from the court and that the trial judge was initially unaware that the individuals had been excluded.  Petitioner argues that this constitutes a factual finding that is contradicted by clear and convincing evidence in the record.  Petitioner also argues that the Court of Appeal relied upon this fact in making the determination that the exclusion of the individuals qualified as a *de minimis* courtroom closure.

The Court disagrees with petitioner that the Court of Appeal made a factual finding that the exclusion of the individuals was inadvertent, let alone a finding that is contradicted by clear and convincing evidence in the record.  In its decision, the Court of Appeals noted that the exclusion was "occasioned by the court's concern that the spectators" might make comments during *voir dire* that may have prejudiced the panel.  Pet., Ex. C at 15.  This language suggests that the Court of Appeal was aware that the exclusion was ordered by the trial court and, therefore, did not make a factual finding to the contrary.  Therefore, there is no factual finding of inadvertence for this Court to evaluate.

### (4).     Substance of the proceedings during the exclusion

Finally, petitioner argues that the Court of Appeal erred when it did not consider the substance of the proceedings during the exclusion as part of its *de minimis* analysis.  Petitioner argues that the federal courts that have endorsed a *de minimis* analysis consider the substance of the closed proceedings when evaluating a closure.  He goes on to argue that the Court of Appeal failed to make a factual finding regarding the substance of proceedings and that a court's failure to make a factual finding where it should have done so can constitute an unreasonable error for purposes of 28 U.S.C. § 2254(d)(2).  *See Taylor v. Maddox*, 366 F.3d 992, 1000-01 (9th Cir. 2004).  Petitioner also asserts that the closed proceedings were very substantive, because many prospective jurors were questioned under oath, several peremptory challenges were made, and three prospective jurors were excused.

The Court of Appeal's *de minimis* analysis is based on California Supreme Court precedent; the United States Supreme Court has no precedent on applying the *de minimis* analysis to *voir dire* closures,

1    and therefore can offer no guidance on the factual findings a court must make. Moreover, the Court of

2    Appeals never made a finding that the proceedings were *not* substantive; instead it seemed to rely on

3    *Presley* and other cases for the proposition that *voir dire* is generally important to a defendant's Sixth

4    Amendment rights, without further inquiries. Therefore, the Court does not find that the failure to make

5    a factual determination of the "substantiveness" of the proceedings during closure was a clear error.

6          Accordingly, the Court is unpersuaded that any of the Court of Appeal's factual findings are

7    contradicted by the "clear and convincing evidence" necessary to rebut the presumption of correctness

8    that attaches to a state court's factual findings for the purposes of habeas review.

9

10   **II.      Petitioner's Right to Present a Defense Claim**

11         Petitioner argues that the trial court, by excluding testimony of a witness who would testify in

12   support of petitioner's theory of the case, violated his Fifth, Sixth, and Fourteenth Amendment rights

13   to present a defense. Petitioner's theory of the case was that a third-party, Mark Pham, not petitioner,

14   committed the charged crime. In support of this theory, petitioner wished to introduce the testimony

15   of a woman who had identified Pham in a photograph as the man who had burglarized her home in Daly

16   City, California four years earlier. The trial court excluded this testimony under California evidentiary

17   laws, and the Court of Appeal found that this exclusion was warranted. Petitioner now argues that the

18   Court of Appeal's rejection of this claim unreasonably applied governing Supreme Court precedent

19   within the meaning of 28 U.S.C. § 2254(d)(1).

20         The Court of Appeal set out its findings of fact and law on this issue as follows:

21               Here, the excluded evidence was the proffered testimony of a burglary victim
           who would purportedly testify with "70 percent certainty" that she recognized Pham
22         from a photograph as the person who burglarized her home in Daly City approximately
           four years prior to the Foster City burglaries. Pham had been investigated as a suspect
23         in that case, but the prosecution declined to file charges "on an insufficient evidence
           basis."
24
                 Bui maintains this evidence was admissible under Evidence Code section 1101,
25         subdivision (b), to show a common plan or scheme on the part of Pham, and that its
           exclusion denied him his due process rights. . . . Bui claims the excluded evidence
26         supplied "powerful support" for his defense theory that Pham was Khuu's accomplice
           in the burglaries because the evidence demonstrated "Pham burglarized a house in 2000
27         employing a modus operandi that is in all relevant respects identical to the MO used in
           the 2004 burglaries." He describes those "relevant respects" as "enter[ing] the house in
28         the homeowner's absence by prying open a sliding glass door in the rear[, and stealing]

                                                      14

1    guns, jade necklaces, other jewelry, credit cards, stamps, and cash."

2         "'To be admissible to demonstrate a distinctive modus operandi, the evidence
3    must disclose common marks or identifiers, that, considered singly or in combination,
     support a strong inference that the defendant committed both crimes.' [Citations.]"
4    (*People v. Carter* (2005) 36 Cal.4th 1114, 1154.) . . . To show similarities in burglaries,
     simply taking the same types of items from similar targets is not sufficient. (See, e.g.,
5    *People v. Grant* (2003) 113 Cal.App.4th 579, 589. [burglaries three years apart, both of
     computer equipment by breaking into schools after hours, entry through open window
6    or prying a door open].)

7         Here, there were no unique factors in both the charged Foster City burglaries and
     the Daly City burglary sufficient to support a strong inference that Mark Pham
8    committed both crimes. There is nothing particularly distinctive, when committing a
     residential burglary, about prying open a rear door when the homeowner is absent and
9    taking easily disposable items of readily apparent value. Moreover, the evidence linking
     Pham to the Daly City crime was not strong; the victim, four years prior, had been only
10   "70 percent certain" it was Pham. Unlike Khuu's testimony, the proffered evidence did
     not link Pham "to the actual perpetration of the crime" in the instant case. (*People v.
11   DePriest*, *supra*, 42 Cal .4th at p. 43.) The trial judge found the evidence lacked
     probative value and would involve undue consumption of time. The court did not abuse
12   its discretion in excluding this evidence, and its exclusion did not deny Bui his
     constitutional right to present a defense.

13   Pet., Ex. C at 18-20.

14        Whether grounded in the Sixth Amendment's guarantee of compulsory process or in the more

15   general Fifth Amendment guarantee of due process, "the Constitution guarantees criminal defendants

16   'a meaningful opportunity to present a complete defense.'" *Holmes v. South Carolina*, 547 U.S. 319,

17   324 (2006) (quoting *Crane v. Kentucky*, 476 U.S. 683 690 (1986)).  The right to present a defense also

18   "includes, 'at a minimum . . . the right to put before a jury evidence that might influence the

19   determination of guilt.'"    *United States v. Stever*, 603 F.3d 747, 755 (9th Cir. 2010) (quoting

20   *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987)).    Thus, the erroneous exclusion of critical,

21   corroborative defense evidence violates the right to present a defense. *DePetris v. Kuykendall*, 239 F.3d

22   1057, 1062 (9th Cir. 2001) (citing *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973) and *Washington

23   v. Texas*, 388 U.S. 14, 18-19 (1967)).

24        However, even where the exclusion of evidence amounts to a constitutional violation, the error

25   will only provide grounds to grant a writ of habeas corpus if the error had a "substantial and injurious

26   effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 637 (1993)

27   (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  In engaging in so-called "harmless-

28   error review," the habeas court looks to the "record as a whole."  *Id.* at 638.

**United States District Court**
For the Northern District of California

15

United States District Court
For the Northern District of California

1   In this case, the excluded testimony was that of a burglary victim who would testify with 70%

2   certainty that Mark Pham had burglarized her home in Daly City four years earlier.  The testimony

3   would not have linked Mark Pham to the crime charged in any way.  Given that the black Range Rover

4   involved in the burglaries belonged to petitioner, that the Foster City police officer William Sandri, who

5   pursued the two suspects once they fled the car, identified petitioner as one of them, that the husband

6   of another witness, who had seen a man hiding in her back yard, later found petitioner's interim driver's

7   license in the yard, that Foster City police officer Eric Egan found petitioner under some bushes in

8   another backyard, that petitioner fled when discovered by Egan, and that Egan and other officers placed

9   petitioner under arrest after a chase, this Court cannot conclude that the exclusion of the aforementioned

10  testimony had a "substantial and injurious effect" on the verdict.

11      Therefore, because the Court finds that exclusion of the evidence was a harmless error, the Court

12  need not determine whether the exclusion of the testimony amounted to a violation of petitioner's

13  constitutional right to present a defense.

14

15                                     **CONCLUSION**

16      For the foregoing reasons, the Court DENIES the petition for writ of habeas corpus.  The clerk

17  shall close the file.

18

19      **IT IS SO ORDERED.**

20

21  Dated: June 26, 2013

22                                     SUSAN ILLSTON
                                       United States District Judge

23

24

25

26

27

28